**IN THE UNITED STATES DISTRICT
COURT FOR THE DISTRICT OF COLUMBIA**

GOTTLIEB MEMORIAL HOSPITAL )
8700 West North Avenue )
Melrose Park, IL 60160 )
)
HOLY CROSS HOSPITAL, INC. )
4725 North Federal Highway )
Fort Lauderdale, FL 33308 )
)
LOYOLA UNIVERSITY MEDICAL CENTER )
2160 South First Avenue )
Maywood, IL 60153 )
)
GOTTLIEB COMMUNITY HEALTH SERVICES )   Civil Action No. _____
CORPORATION D/B/A MACNEAL HOSPITAL )
3249 South Oak Park Avenue )
Berwyn, IL 60402 )
)
MERCY HEALTH PARTNERS D/B/A MERCY )
HEALTH MUSKEGON )
1700 Clinton Street )
Muskegon, MI 49442-5502 )
)
MERCY HEALTH SERVICES – IOWA, CORP )
D/B/A MERCY MEDICAL CENTER NORTH )
IOWA )
1000 4th Street )
Mason City, IA 50401 )
)
MERCY HEALTH SERVICES – IOWA, CORP )
D/B/A MERCY MEDICAL CENTER SIOUX )
CITY )
801 Fifth Street )
Sioux City, IA 51101 )
)
MOUNT CARMEL HEALTH SYSTEM D/B/A )
MOUNT CARMEL ST. ANN'S )
500 S. Cleveland Ave )
Westerville, OH  43081 )
)
MOUNT CARMEL HEALTH SYSTEM D/B/A )
MOUNT CARMEL WEST )

6150 E Broad Street                          )
Columbus, OH 43213                           )
                                             )
OUR LADY OF LOURDES MEDICAL CENTER           )
1600 Haddon Avenue                           )
Camden, NJ 08103                             )
                                             )
SAINT ALPHONSUS REGIONAL MEDICAL             )
CENTER, INC.                                 )
1055 North Curtis Road                       )
Boise, ID 83706                              )
                                             )
SAINT FRANCIS HOSPITAL, INC.                 )
7th & Clayton Streets                        )
Wilmington, DE  19805                        )
                                             )
SAINT FRANCIS HOSPITAL AND                   )
MEDICAL CENTER                               )
114 Woodland Street                          )
Hartford, CT  06105-1208                     )
                                             )
TRINITY HEALTH – MICHIGAN D/B/A SAINT        )
JOSEPH MERCY HOSPITAL ANN ARBOR              )
5301 E. Huron River Dr                       )
Ann Arbor, MI  48106                         )
                                             )
TRINITY HEALTH – MICHIGAN D/B/A SAINT        )
JOSEPH MERCY OAKLAND HOSPITAL                )
44405 Woodward Avenue                        )
Pontiac, MI  48341                           )
                                             )
SAINT JOSEPH REGIONAL                        )
MEDICAL CENTER – SOUTH BEND CAMPUS,          )
INC.                                         )
5215 Holy Cross Parkway                      )
Mishawaka, IN  46545                         )
                                             )
SAINT JOSEPH'S HEALTH, INC. D/B/A            )
SAINT JOSEPH'S HOSPITAL HEALTH CENTER        )
301 Prospect Avenue                          )
Syracuse, NY  13203                          )
                                             )
TRINITY HEALTH – MICHIGAN D/B/A SAINT        )
MARY'S HEALTH CARE

200 Jefferson SE                                          )
Grand Rapids, MI 49503-4502                               )
                                                         )
SAINT MARY'S HOSPITAL, INC.                              )
56 Franklin Street                                        )
Waterbury, CT 06706                                       )
                                                         )
SAINT PETER'S HOSPITAL OF THE CITY OF                    )
ALBANY  D/B/A SAINT PETER'S HOSPITAL                     )
315 S. Manning Blvd.                                      )
Albany, NY  12208                                         )
                                                         )
             Plaintiffs,                                  )
                                                         )
       v.                                                 )
                                                         )
XAVIER BECERRA, in his official capacity                 )
as Secretary, United States Department of Health          )
and Human Services,                                       )
200 Independence Avenue, SW                               )
Washington, DC 20202                                      )
                                                         )
             Defendant.                                   )

## COMPLAINT FOR JUDICIAL REVIEW OF FINAL ADVERSE AGENCY ACTION AND FOR SUMS DUE UNDER THE MEDICARE ACT

Plaintiffs, Gottlieb Memorial Hospital, Holy Cross Hospital, Inc., Loyola University Medical Center, Gottlieb Community Health Services Corporation d/b/a MacNeal Hospital, Mercy Health Partners d/b/a Mercy Health Muskegon, Mercy Health Services – Iowa, Corp. d/b/a Mercy Medical Center North Iowa, Mercy Health Services – Iowa, Corp. d/b/a Mercy Medical Center Sioux City, Mount Carmel Health System d/b/a Mount Carmel St. Ann's, Mount Carmel Health System d/b/a Mount Carmel West, Our Lady of Lourdes Medical Center, Saint Alphonsus Regional Medical Center, Inc., Saint Francis Hospital, Inc., Saint Francis Hospital and Medical Center, Trinity Health – Michigan d/b/a Saint Joseph Mercy Hospital Ann Arbor, Trinity Health

– Michigan d/b/a Saint Joseph Mercy Oakland Hospital, Saint Joseph Regional Medical Center – South Bend Campus, Inc., Saint Joseph's Health Inc. d/b/a Saint Joseph's Hospital Health Center, Trinity Health – Michigan d/b/a Saint Mary's Health Care, Saint Mary's Hospital, Inc. and Saint Peter's Hospital of the City of Albany d/b/a Saint Peter's Hospital (collectively "Plaintiffs") bring this Complaint for Judicial Review against Defendant Xavier Becerra, in his official capacity as Secretary ("Secretary") of Health and Human Services ("HHS"), and allege as follows:

## I.    INTRODUCTION

1.      The Plaintiffs in this matter, all of which are not-for-profit teaching hospitals within the Trinity Health system, have been underpaid by Medicare for their inpatient services.  The Plaintiffs bring this action for judicial review of the HHS Secretary's final decision.  The Plaintiffs are seeking an adjustment to their inpatient payments, such that the payments are consistent with the governing statute.

2.      Although originally the Medicare program paid hospitals retrospectively for their reasonable costs of treating Medicare beneficiaries, the Medicare statute was revised effective in 1983 to pay on a prospective basis for inpatient admissions.  To determine that prospective rate, the Medicare program creates certain diagnosis-related groups, referred to as "DRGs."  The diagnoses included in each of these groups are all similar from a clinical and resource utilization perspective, and are therefore all paid at the same rate.  The payment rates vary among the different DRGs, based on data the Medicare program collects from hospitals regarding their relative costs of treating patients falling within each such group.  The system is thus designed to fairly reflect relative cost, while encouraging efficiency through the application of a fixed rate, irrespective of the costs of a given patient.

3.      From its inception, Congress recognized that not all hospitals would fare equally

well under a prospective payment system. Some categories of hospitals simply have higher, legitimate costs in treating patients due to a wide variety of factors, not all of which are in a hospital's control. One such category is comprised of teaching hospitals.

4.      Building off of statistical analyses performed by the Medicare program itself before the inception of DRG payments, Congress created a teaching hospital adjustment, paid as a per-discharge add-on to the otherwise applicable DRG. As memorialized in statute, this indirect medical education ("IME") payment adjustment is correlated to the magnitude of increased teaching hospital costs. *See generally*, <u>Riverside Methodist Hospital v. Thompson</u>, 2003 WL 22658129 (S.D. Ohio 2003). Through its statistical analysis, the Medicare program determined that teaching hospital costs increase with the number of full-time equivalent ("FTE") interns and residents, and decrease as a hospital's bed complement increases. Essentially, the ratio of interns and residents to beds, referred to as the "IRB Ratio," serves as a measure of a hospital's teaching intensity, and therefore figures prominently in the IME payment adjustment. *Id*. at *11; 42 U.S.C. § 1395ww(d)(5)(B)(iv).

5.      Leveraging off of the data available to Congress at the time of the statute's passage, the statute uses a precise formula to convert the IRB Ratio to a specific IME adjustment, represented mathematically as: IME Multiplier x $[(1+\text{IRB Ratio})^{0.405} -1]$. Since this formula can only approximate additional costs fairly when applied consistently, Congress instructed that the 1983 calculation methodology remain constant.

6.      Notwithstanding Congress's instructions, the Secretary changed the calculation of the bed count factor effective in Federal fiscal year ("FFY") 2013. At that time, the Centers for Medicare & Medicaid Services ("CMS"), which is the Secretary's agency charged with administering the Medicare program, determined to expand the beds included in the IRB Ratio.

Specifically, CMS decided to include labor & delivery ("L&D") beds, even as it acknowledged that those beds had historically been excluded. The effect of that decision was to dilute the IRB Ratio, and, correspondingly, to reduce IME payments. In so doing, CMS undermined the integrity of the IME calculation and violated Congress's express instruction.

7.      The Plaintiffs filed appeals with the Secretary's Provider Reimbursement Review Board (the "Board"), challenging the final determination of their IME calculations. Appeals to the Board are available upon settlement of individual Medicare cost reports, which are filed annually. Plaintiffs' appeals have been initiated for each year beginning with 2014.

8.      When the Board does not have authority to issue the relief requested by a hospital, such as when the validity of a regulation is being challenged, the Medicare statute provides for expedited judicial review. The Board has granted expedited judicial review in a series of decisions pertaining to cost reporting years 2014, 2015, 2016, and 2018, which decisions were issued between November 13, 2023 and December 21, 2023 (attached hereto as **Exhibit 1**). Plaintiffs now file this action for sums due under the Medicare Act, and for judicial review under the Medicare Act and the Administrative Procedure Act of the Secretary's final determinations of payment for Plaintiffs' IME reimbursement.

## II.    PARTIES

9.      Plaintiff, Gottlieb Memorial Hospital, is a teaching hospital located in Melrose Park, Illinois that participates in the Medicare program (Provider No. 14-0008). Plaintiff challenges Medicare's 2013 change to the regulation and the program's determination of its IME payment for fiscal year 2015.

10.     Plaintiff, Holy Cross Hospital, Inc., is a teaching hospital located in Fort Lauderdale, Florida that participates in the Medicare program (Provider No. 10-0073). Plaintiff

challenges Medicare's 2013 change to the regulation and the program's determination of its IME payment for fiscal years 2016 and 2018.

11.    Plaintiff, Loyola University Medical Center, is a teaching hospital located in Maywood, Illinois that participates in the Medicare program (Provider No. 14-0276).  Plaintiff challenges Medicare's 2013 change to the regulation and the program's determination of its IME payment for fiscal years 2015, 2016 and 2018.

12.    Plaintiff, Gottlieb Community Health Services Corporation d/b/a MacNeal Hospital, is a teaching hospital located in Berwyn, Illinois that participates in the Medicare program (Provider No. 14-0054).  Plaintiff challenges Medicare's 2013 change to the regulation and the program's determination of its IME payment for fiscal year 2018.

13.    Plaintiff, Mercy Health Partners d/b/a Mercy Health Muskegon, is a teaching hospital located in Muskegon, Michigan that participates in the Medicare program (Provider No. 23-0066).  Plaintiff challenges Medicare's 2013 change to the regulation and the program's determination of its IME payment for fiscal years 2016 and 2018.

14.    Plaintiff, Mercy Health Services – Iowa, Corp. d/b/a Mercy Medical Center North Iowa, is a teaching hospital located in Mason City, Iowa that participates in the Medicare program (Provider No. 16-0064).  Plaintiff challenges Medicare's 2013 change to the regulation and the program's determination of its IME payment for fiscal years 2015, 2016 and 2018.

15.    Plaintiff, Mercy Health Services – Iowa, Corp. d/b/a Mercy Medical Center Sioux City, is a teaching hospital located in Sioux City, Iowa that participates in the Medicare program (Provider No. 16-0153).  Plaintiff challenges Medicare's 2013 change to the regulation and the program's determination of its IME payment for fiscal years 2015, 2016 and 2018.

16.    Plaintiff, Mount Carmel Health System d/b/a Mount Carmel St. Ann's, is a teaching

hospital located in Westerville, Ohio that participates in the Medicare program (Provider No. 36-0012).   Plaintiff challenges Medicare's 2013 change to the regulation and the program's determination of its IME payment for fiscal years 2015, 2016 and 2018.

17.      Plaintiff, Mount Carmel Health System d/b/a Mount Carmel West, is a teaching hospital located in Grove City, Ohio that participates in the Medicare program (Provider No. 36-0035).   Plaintiff challenges Medicare's 2013 change to the regulation and the program's determination of its IME payment for fiscal years 2016 and 2018.

18.      Plaintiff, Our Lady of Lourdes Medical Center, is a teaching hospital located in Camden, New Jersey that participates in the Medicare program (Provider No. 31-0029).  Plaintiff challenges Medicare's 2013 change to the regulation and the program's determination of its IME payment for fiscal years 2015 and 2018.

19.      Plaintiff, Saint Alphonsus Regional Medical Center, Inc. is a teaching hospital located in Boise, Idaho that participates in the Medicare program (Provider No. 13-0007).  Plaintiff challenges Medicare's 2013 change to the regulation and the program's determination of its IME payment for fiscal years 2014, 2015, 2016, and 2018.

20.      Plaintiff, Saint Francis Hospital, Inc. is a teaching hospital located in Wilmington, Delaware that participates in the Medicare program (Provider No. 08-0003).  Plaintiff challenges Medicare's 2013 change to the regulation and the program's determination of its IME payment for fiscal years 2014, 2015, 2016, and 2018.

21.      Plaintiff, Saint Francis Hospital and Medical Center, is a teaching hospital located in Hartford, Connecticut that participates in the Medicare program (Provider No. 07-0002). Plaintiff challenges Medicare's 2013 change to the regulation and the program's determination of its IME payment for fiscal years 2016 and 2018.

22.      Plaintiff, Trinity Health – Michigan d/b/a Saint Joseph Mercy Hospital Ann Arbor, is a teaching hospital located in Ann Arbor, Michigan that participates in the Medicare program (Provider No. 23-0156).  Plaintiff challenges Medicare's 2013 change to the regulation and the program's determination of its IME payment for fiscal years 2016 and 2018.

23.      Plaintiff, Trinity Health – Michigan d/b/a Saint Joseph Mercy Oakland Hospital, is a teaching hospital located in Pontiac, Michigan that participates in the Medicare program (Provider No. 23-0029).  Plaintiff challenges Medicare's 2013 change to the regulation and the program's determination of its IME payment for fiscal years 2016 and 2018.

24.      Plaintiff, Saint Joseph Regional Medical Center – South Bend Campus, Inc., is a teaching hospital located in Mishawaka, Indiana that participates in the Medicare program (Provider No. 15-0012).  Plaintiff challenges Medicare's 2013 change to the regulation and the program's determination of its IME payment for fiscal years 2015, 2016 and 2018.

25.      Plaintiff, Saint Joseph's Health, Inc. d/b/a Saint Joseph's Hospital Health Center, is a teaching hospital located in Syracuse, New York that participates in the Medicare program (Provider No. 33-0140).  Plaintiff challenges Medicare's 2013 change to the regulation and the program's determination of its IME payment for fiscal years 2015, 2016 and 2018.

26.      Plaintiff, Trinity Health – Michigan d/b/a Saint Mary's Health Care, is a teaching hospital located in Grand Rapids, Michigan that participates in the Medicare program (Provider No. 23-0059).  Plaintiff challenges Medicare's 2013 change to the regulation and the program's determination of its IME payment for fiscal years 2015, 2016 and 2018.

27.      Plaintiff, Saint Mary's Hospital, Inc., is a teaching hospital located in Waterbury, Connecticut that participates in the Medicare program (Provider No. 07-0016).  Plaintiff challenges Medicare's 2013 change to the regulation and the program's determination of its IME

payment for fiscal years 2016 and 2018.

28.      Plaintiff, Saint Peter's Hospital of the City of Albany d/b/a Saint Peter's Hospital, is a teaching hospital located in Albany, New York that participates in the Medicare program (Provider No. 33-0057).  Plaintiff challenges Medicare's 2013 change to the regulation and the program's determination of its IME payment for fiscal years 2015, 2016, and 2018.

29.      Defendant Xavier Becerra ("the Secretary"), is the Secretary of HHS, the federal cabinet-level department that, through its agency CMS, administers the Medicare program. References to the Secretary herein are meant to refer to him, his subordinate agencies and officials, and to his official predecessors or successors as the context requires.

## III.    JURISDICTION AND VENUE

30.      This Court possesses subject matter jurisdiction under 28 U.S.C. § 1331 because this action arises under the Medicare Act, title XVIII of the Social Security Act ("SSA"), 42 U.S.C. §§ 1395 *et seq.*, and the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 551 *et seq*.

31.      Jurisdiction and venue are proper under 42 U.S.C. §§ 1395oo(a)(1)(A)(i) and 1395oo(f)(1).

32.      Plaintiffs timely seek judicial review of a final agency decision for which no further administrative review is available, and Plaintiffs have exhausted their administrative remedies.

33.      Plaintiffs possess statutory standing under 5 U.S.C. § 702, Article III standing, and are within the relevant zone of interests protected by the Medicare statute because Plaintiffs are aggrieved by the final decision of the Secretary and have suffered cognizable legal injury.

## IV.    REVIEW OF MEDICARE PAYMENT DETERMINATIONS

34.      After the close of each fiscal year, a hospital is required to file a "cost report" with a Medicare Administrative Contractor designated by the Secretary.  42 C.F.R. §§ 413.20, 413.24.

35.      The Medicare Administrative Contractor analyzes a hospital's cost report and issues a year-end determination as to the amount of Medicare program reimbursement due the hospital for services furnished to Medicare patients during the fiscal year covered by the cost report. *See* 42 C.F.R. § 405.1803.

36.      A hospital may appeal a Medicare Administrative Contractor's determination as to the total amount of Medicare program reimbursement due to the hospital for the fiscal year covered by a cost report to the Secretary's Board. *See* 42 U.S.C. § 1395oo(a)(1); 42 C.F.R. §§ 405.1835-405.1877.

37.      The Medicare statute authorizes the Board to determine that it is without authority to decide the question of law or regulations relevant to a matter in controversy in an appeal before the Board and grant the right to expedited judicial review.  42 U.S.C. § 1395oo(f)(1).  Pursuant to the Secretary's regulations, the Board is bound by agency regulations. 42 C.F.R. § 405.1867. Accordingly, the statute allows a hospital to request a Board determination as to its authority to decide a question of law or regulations and to initiate an action in this court if the Board determines that expedited judicial review is appropriate. *See* 42 U.S.C. § 1395oo(f)(1).

## V.      PROCEEDINGS BELOW

38.      Each Plaintiff hospital received a final determination of reimbursement issued by its respective Medicare Administrative Contractor for each of the cost reporting periods at issue. Each final determination indicated that each Plaintiff's IME calculation included L&D beds in the IRB Ratio, based on the 2013 change to the regulation.

39.      Each Plaintiff timely requested a hearing before the Board to appeal the impact of the Secretary's regulation on its IME calculation for each year at issue and otherwise met applicable jurisdictional requirements for seeking Board review.

40.     Plaintiffs requested that the Board determine the Plaintiffs' qualification for expedited judicial review, pursuant to 42 C.F.R. § 405.1842, in a series of filings submitted between October 27, 2023 and December 12, 2023.

41.     The Board approved the Plaintiffs' expedited judicial review requests to challenge the validity of the Secretary's change in his IME calculation methodology in a series of decisions issued between November 13, 2023 and December 21, 2023.  Specifically, this action is an appeal of Board case numbers 17-0247GC (pertaining to 2014), 17-1196GC (pertaining to 2015), 18-1301GC (pertaining to 2016), and 21-1253GC (pertaining to 2018).

42.     Plaintiffs are timely commencing this action within 60 days of the Board's November 13, 2023 first determination to grant an expedited judicial review request, pursuant to 42 U.S.C. § 1395oo(f)(1).

## VI.    APPLICABLE LAW

### A.    Background

43.     The Federal Medicare program provides health insurance to the aged, blind and disabled under title XVIII of the Social Security Act.

44.     The Medicare program consists of four parts, Parts A through D.  Among the services covered under Medicare Part A are inpatient hospital services.  *See* 42 U.S.C. § 1395d(a)(1).

45.     When Medicare was first enacted, hospitals were reimbursed on a cost basis. 42 U.S.C. § 1395x(v)(1)(A); *see also* S. Guterman & A. Dobson, Impact of the Medicare Prospective Payment System for Hospitals, 7 HEALTH CARE FINANCE REVIEW 3 at 97-114 (Spring 1986) (discussing the history of the Medicare hospital reimbursement system prior to the Social Security Amendments of 1983).

46.     Over time, however, it was recognized that costs could be better contained if hospitals were paid for their costs prospectively, based on the expected costs associated with the diagnosis of the patient treated.  Such a system better encourages efficiency than the prior system of payment based on a hospital's retrospective calculation of its reasonable costs for the year.

47.     Thus, Congress, through a series of legislative changes, phased in a prospective payment system for hospital inpatient costs.

48.     Congress first required the Medicare program to implement a prospective payment system for operating costs in 1983. Social Security Amendments of 1983, Pub. L. No. 98-21 § 601; 42 U.S.C. § 1395ww(d)(1).   At its most fundamental level, this system entails payment for operating costs based on the expected costs of treating patients with a particular diagnosis. 42 U.S.C. § 1395ww(b)(2).

49.     Each type of diagnosis falls within a DRG that is associated with a specific weighting.  42 U.S.C. § 1395ww(d)(4). The weighting is multiplied by a "standardized amount" to result in the payment for that particular admission. 42 U.S.C. § 1395ww(d)(3)(A).

50.     From the inception of the prospective payment system, Congress recognized that a "one size fits all" approach could result in inequities to certain providers that would work to the detriment of Medicare beneficiaries.  One provider group in particular potentially suffering from financial harm are teaching hospitals.  Hence Congress created the IME adjustment.  Congress enacted the IME adjustment due to "serious concerns" about the ability of the prospective payment system to account for a "number of factors," such as the severity of patients' illness and the "specialized services and treatment programs provided by teaching hospitals," which may legitimately increase the allowable operating costs incurred by teaching hospitals.  H.R. Rep. No. 98-21, 140-41 (1983), *reprinted in* 1983 U.S.C.C.A.N. 299, 359-60; *see also* S. Rep. No. 98-23,

52-53 (193), *reprinted in* 1983 U.S.C.C.A.N. 143, 192-93.

51.     The IME adjustment, having undergone various iterations, currently reads as follows:

> (B) **The Secretary shall provide for an additional payment amount for** subsection (d) **hospitals with indirect costs of medical education, in an amount computed in the same manner as the adjustment for such costs under regulations (in effect as of January 1, 1983)** under subsection (a)(2) [provision pertaining to per-diem cap exceptions], **except as follows**:
>
>     (i) The amount of such additional payment shall be determined by multiplying (I) [the DRG payment, and, as applicable, the outlier payment] by (II) the indirect teaching adjustment factor described in clause (ii).
>
>     (ii) For purposes of clause (i)(II), the indirect teaching adjustment factor is equal to $c \times (((1+r) \text{ to the nth power}) -1)$, where "r" is the ratio of the hospital's full-time equivalent interns and residents to beds and "n" equals .405.

42 U.S.C. § 1395ww(d)(5)(B) (emphasis added).  The IRB Ratio, which, as described earlier reflects a hospital's teaching intensity, is described in subparagraph (ii), and drives the calculation of the IME payment adjustment.

52.     As indicated by the statute, the 1983 payment methodology remains important to this day, other than as expressly superseded by this same statutory provision.

        **B.     Evolution of the IME Payment Adjustment**

53.     Historical records indicate how the IME payment adjustment was calculated as of January 1, 1983.  During the period when hospitals were paid based on their reasonable costs, they were not allowed to incur costs without limit.  Rather, they were subject to per diem caps. Statement of Henry R. Desmarais, M.D., Director, Bureau of Eligibility, Reimbursement, and Coverage, Health Care Financing Administration, Before the Subcommittee on Health, Committee of Finance, United States Senate, Senate Hearing 98-1264 (October 1, 1984), p. 38.  Yet, just as with prospective payment, a fixed cap disadvantaged teaching hospitals, given their more intensive cost structure.  Accordingly, the Medicare program created a per diem cap adjustment for teaching

hospitals that was explained as follows:

> Based on the data we used to derive the proposed limits, we have estimated that a hospital's general inpatient routine operating costs may be expected to increase by a factor of .047 for each increase of .1 (above zero) in the ratio of its full-time equivalent (FTE) interns and residents (in approved programs) to its number of beds.

45 Fed. Reg. 21582, 21584 (Apr. 1, 1980).  In other words, the Medicare program recognized the importance of FTEs and beds as explaining teaching hospital costs even before the enactment of prospective payment.

54.    Congress carried over this calculation with very little change when creating the prospective payment system.  The original version of the IME payment adjustment read as follows:

> (B) The Secretary shall provide for an additional payment amount for subsection (d) hospitals with indirect costs of medical education, in an amount computed in the same manner as the adjustment for such costs under regulations (in effect as of January 1, 1983) under subsection (a)(2) of this section, except that in the computation under this subparagraph the Secretary shall use an educational adjustment factor equal to twice the factor provided under such regulations.

42 U.S.C. § 1395ww(d)(5)(B) (1984 version).  The per diem adjustment became an additional payment amount, but that amount was then doubled, pursuant to the statute.  No changes were made to the manner in which FTEs or beds were to be counted.

55.    After the statute's initial enactment, Congress considered whether in fact it had developed precisely the right payment adjustment.  To aid in that effort, the Congressional Budget Office ("CBO") was tasked with re-examining the data pertaining to the correlation between the IRB Ratio and costs and made recommendations as to how to refine the calculation.  Congressional Budget Office, The Indirect Teaching Adjustment for Medicare's Prospective Payment System: Issues and Options (the "CBO 1985 Report"), pp. 1-2; *see also* H.R. Rept. 99-241 (July 31, 1985), p. 2 (referencing the CBO 1985 Report as guiding the revisions to the IME statute).

56.     The CBO conducted its review by examining Medicare 1981 cost report data both for data regarding hospital costs, as well as for the FTE and hospital bed count data used in calculating the IRB Ratio.  CBO 1985 Report, page 15 and table 6.

57.     The recommendation from CBO resulting from its review led to Congress' amendment of the IME payment adjustment.  The CBO determined that the IRB Ratio impact on teaching hospital costs is curvilinear, which is why the IME payment adjustment is expressed as a fractional exponent (a mathematical tool for expressing a curvilinear relationship).  H.R. Rept. 99-241 at p. 2.  To precisely quantify how the IRB Ratio impacts costs, based on the CBO's recommendation, that fractional exponent was set at .405.  *See* S. Hearing 100-263 (Apr. 7, 1987), p. 59 (stating "[t]he specific estimate of 4.05 percent was made by the Congressional Budget Office (CBO) and forms the basis for the indirect medical education factor mandated by the Consolidated Omnibus Budget Reconciliation Act of 1985.").

58.     As a result of the CBO's review and recommendations, Congress revised the statute as follows:

> (B) The Secretary shall provide for an additional payment amount for subsection (d) hospitals with indirect costs of medical education, in an amount computed in the same manner as the adjustment for such costs under regulations (in effect as of January 1, 1983) under subsection (a)(2) of this section [provision pertaining to per-diem cap exceptions], except as follows:
>
> (i) The amount of such additional payment shall be determined by multiplying (I) [the DRG and, as applicable, outlier payments] by (II) the indirect teaching adjustment factor described in clause (ii).
>
> (ii) For purposes of clause (i)(II), the indirect teaching adjustment factor for discharges occurring-(I) on or after May 1, 1986, and before October 1, 1989, is equal to 2 x $((1+r)^{.405}-1)$, or (II) on or after October 1, 1989, is equal to 1.5 x $((1+r)^{.5795})$, where "r" is the ratio of the hospital's fulltime equivalent interns and residents to beds.

42 U.S.C. § 1395ww(d)(5)(B) (1987 version) (enacted by Section 9104 of the Consolidated Omnibus Budget Reconciliation Act of 1985, Pub. L. 99-272, enacted April 7, 1986).  The .405

teaching factor remains in the statute to this day.[1]  As with the initial version of this statutory provision, it is equally apparent from the revised version that data has driven the specific statutory instruction.  As referenced above, the specific dataset used to generate this calculation was data from hospital 1981 cost reports.  Accordingly, the statute continues to enshrine the rules for generating this calculation in 1983 so as to maintain integrity of the formula, and the correlation between payment and costs, in later years.

### C.    The Disproportionate Share Hospital Calculation

59.    Separate and apart from the IME payment adjustment, Congress also determined that safety net hospitals encounter cost pressures under a prospective payment system that need to be alleviated.  Accordingly, Congress created the disproportionate share hospital ("DSH") adjustment, which calculates an add-on payment to DSH providers based on the number of indigent Medicare patients and Medicaid patients they treat.  42 U.S.C. § 1395ww(d)(5)(F).  Congress makes a distinction in this calculation, however, for hospitals with fewer than, or more than, 100 beds. *See*, *.e.g.*, 42 U.S.C. § 1395ww(d)(5)(F)(i)(II).  Notably, there is no cross-reference in this statutory provision to the IME bed calculation or any reference to the bed counting methodology in effect in 1983.

### D.    Medicare's Historic Definition of "Bed"

60.    As explained above, the IRB Ratio is based in part on the calculation of a teaching hospital's bed count, using the bed count methodology in effect in 1983.  It was that methodology that was used by the Medicare program in originally calculating the correlation between teaching hospital costs and beds.  It was that same methodology that CBO used when refining the

---

[1]    Although the reduced teaching factor was to sunset beginning on October 1, 1989, that sunset was repealed by Section 4002 of the Omnibus Budget Reconciliation Act of 1990, Pub. L. 101-508 (enacted Nov. 5, 1990).

methodology several years later.  It is therefore understandable why Congress chose to commit the Medicare program to using that same methodology in later years as well.

61.    The CMS Administrator has acknowledged that, in that time period, L&D beds were excluded.  In an opinion issued by the Administrator, a provision from a Medicare manual from 1976 is quoted at length, providing the applicable definition of "bed:"

> Bed Size Definition. For purposes of this section, a bed (either acute care or long-term care is defined as an adult or pediatric bed (exclusive of a new-born bed) maintained for lodging inpatients, including beds in intensive care units, coronary care units, and other special care inpatient hospital units. Beds in the following locations are excluded from the definition: beds in sub-provider components, hospital-based skilled nursing facilities or beds located in any non-certified inpatient area(s) of the facility, beds in labor rooms, postanesthesia or postoperative recovery rooms, outpatient areas, emergency room, ancillary departments, nurses and other staff residences and other such areas which are regularly maintained and utilized for only a portion of the stay of the patients or for purposes other than inpatient lodgings.

Highland Medical Center v. Mutual of Omaha Insurance Company, CMS Adm'r Dec. reviewing PRRB Dec. No. 2006-D10 (dated Feb. 24, 2006), FN 33 (quoting the Provider Reimbursement Manual I, § 2510.5A (1976 version) (emphasis added).

62.    That same Manual provision, even now, excludes these beds, along with postanesthesia and postoperative recovery rooms, outpatient areas, and assorted other areas. Provider Reimbursement Manual I, § 2405.3G.  None of these types of units, all of which are considered "ancillary" areas, have historically been used for inpatient lodging and have historically all been excluded from the bed count.

63.    When the CBO conducted its review to refine the IME calculation, as memorialized in the 1985 statutory amendments, it used 1981 cost report data, as referenced above.  CMS's recitation of the historic definition of "bed" establishes that the bed counts CBO considered excluded the count the L&D beds.

### E.    Regulatory Change to the Definition of "Bed"

64.    Up through 2013, the Secretary continuously excluded L&D beds from the IRB Ratio bed count, consistent with the statutory dictate to adhere to the 1983 payment methodology.

65.    However, the Secretary revisited its bed exclusion policy in rulemaking in 2012. In that rulemaking, the Secretary explained that it had changed its **DSH** calculation rules in 2010. Unlike the IME calculation, the DSH calculation includes as an element certain inpatient days. The Secretary acknowledged that historically it excluded labor & delivery days from the calculation of inpatient days.  77 Fed. Reg. 53258, 53411 (Aug. 31, 2012).  However, in light of the fact that Medicare reimburses for services in these units under the inpatient prospective payment system, the Secretary decided that days in these units should be included in the DSH calculation.  *Id*.

66.    As an extension of the decision regarding considering as inpatient days the days in the labor & delivery unit, the Secretary revisited its policy on L&D beds.  Having included the days for these units for DSH calculation purposes, the Secretary now decided to also include the beds in bed counts.  *Id*. at 53412.  However, this policy was not limited to the bed count for the DSH calculation.  The Secretary also applied it to IME.  *Id*.

67.    To implement this policy change, the Secretary revised 42 C.F.R. § 412.105(b), which is the regulatory provision that specifies excluded beds, such that there is no longer a reference to L&D beds among the categories of excluded beds.

68.    CMS offered the following reasoning for its decision:

> [B]ecause we have described labor and delivery patient days as being generally payable under the IPPS (74 FR 43900), we believe that the bed in which such services are furnished should also be considered to be available for IPPS-level acute care hospital services, and should be included in the count of beds available for IPPS-level acute care hospital services.

*Id.* CMS's implicit test for inclusion of beds in the IRB Ratio is thus whether reimbursement for services to patients treated in those beds are made under the inpatient prospective payment system.

69.      CMS does not reference the IME statute in its discussion of this regulatory change. CMS does not reference the statutory requirement that the 1983 calculation methodology be followed, unless expressly stated otherwise.  CMS does not reference how the IRB Ratio is a measure of teaching intensity.  In fact, CMS offers no rationale at all as to how its revised bed definition serves any purpose consistent with the IME statutory's plain meaning or manifest intent.

## VII.   THE SECRETARY'S BED COUNT REGULATION IS INVALID BECAUSE IT IS CONTRARY TO THE STATUTE'S PLAIN MEANING AND MANIFEST INTENT, AND IS OTHERWISE ARBITRARY AND CAPRICIOUS

70.      The statute expressly states that the methodology to be followed is the one the Medicare program used in 1983.  The CMS Administrator affirms that this methodology excluded L&D beds as "ancillary." Changing the definition of beds is therefore acting beyond the Secretary's authority under the statute.

71.      The revised definition also violates the statute's manifest intent, which is to ensure the integrity of its calculation of the IRB Ratio, serving as a proxy of teaching intensity and thereby explaining hospital costs.  Changing one variable in that calculation necessarily requires that all of the others be reconsidered, which CMS has not done, and, under the statute, cannot do.  Therefore, the definitions for none of the variables can be altered, any more so than CMS can veer from the 0.405 exponent without statutory authorization.

72.      The regulation is also unlawful because it is arbitrary and capricious. A fundamental rule of administrative law is that agencies must "articulate a satisfactory explanation for [their] action[s] including a 'rational connection between the facts found and the choice[s] made.'" <u>Motor Veh. Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.</u>, 463 U.S. 29, 43 (1983) (quoting Burlington Truck Lines v. United States, 371 U.S. 156, 168 (1962)); <u>Encino Motorcars,</u>

LLC v. Navarro, 136 S. Ct. 2117, 2125 (2016) ("One of the basic procedural requirements of administrative rulemaking is that an agency must give adequate reasons for its decisions."). CMS does not, however, reference the IME statute, much less explain how the inclusion of L&D beds is a better interpretation of the statute than its prior policy.

73.     Similarly, CMS does not offer any explanation as to how the IRB Ratio better reflects a hospital's teaching intensity, once those beds are included. Needless to say, CMS does not include any data analysis supporting any claim that teaching hospital costs are better correlated with the revised IRB Ratio calculation.

74.     The regulation is also unlawful because it treats similar situations differently, without sufficient explanation. As evidenced above, the Medicare program has consistently considered L&D beds to be ancillary beds. In that way, they are comparable to recovery beds. Patients in a recovery bed may very well be in a stay reimbursed under the inpatient prospective payment system, and yet those beds remain excluded.

75.     CMS has not explained how these two types of beds are different in a way that justifies the differences in their treatment for reimbursement purpose. Agencies are not allowed to treat similarly situated circumstances differently, without sufficient justification. Transactive Corp v. United States, 91 F.3d 232 (D.C. Cir. 1996). Thus, CMS's 2012 regulatory change is unlawful and must be overturned.

## VIII.   STANDARD OF REVIEW AND ASSIGNMENT OF ERROR

76.     42 U.S.C. § 1395oo(f) provides for review of the Board's decisions below and the Secretary's promulgation of the regulation at issue pursuant to the applicable provisions of the APA. The applicable provisions of the APA require a reviewing court to set aside agency action if it finds that action to be contrary to law, arbitrary, capricious, unsupported by substantial

evidence, in excess of statutory authority or otherwise not in accordance with law. *Id.*

77.     This Court has jurisdiction to decide the validity of the Secretary's regulation pursuant to 42 U.S.C. § 1395oo(f)(1) because the Board determined that it lacks the authority to decide the validity of the regulation at issue. *See* <u>Allina Health Servs. V. Price</u>, 863 F.3d 937, 941 (D.C. Cir. 2017) (noting that the Board's granting of expedited judicial review cannot be questioned by Federal courts) (affirmed on other grounds in 139 S.Ct. 1804 (Jun 03, 2019)).

78.     Medicare's decision to include L&D beds in the IRB Ratio bed count used in the IME calculation, as reflected in revised 42 C.F.R. § 412.105(b), is contrary to the plain meaning of the Medicare Act, its manifest intent, is arbitrary and capricious, and is not supported by substantial evidence. *See* 5 U.S.C. §§ 706(2)(A), (C), and (E).

## IX.     REQUEST FOR RELIEF

For the foregoing reasons, the Plaintiffs respectfully requests that this Court issue:

a)      A declaration that the modification to 42 C.F.R. § 412.105(b) is unlawful and must be overturned or, in the alternative, set aside as it relates to Plaintiffs.

b)      An order requiring the Medicare program to pay to Plaintiffs, with interest, all sums associated with the IME calculation as would have been paid, but for the unlawful change to the bed count regulation.

c)      An order requiring the Medicare program to pay legal fees and costs of suit incurred by Plaintiffs; and

d)      Grant such other relief as the Court may consider appropriate.


Respectfully Submitted,


*/s/ Andrew D Ruskin*

Andrew D. Ruskin
DC Bar No. 475824
K&L GATES LLP
1601 K Street, N.W.
Washington, D.C. 20004
(202) 778-9000 (phone)
(202) 778-9100 (fax)
andrew.ruskin@klgates.com

Counsel for Plaintiffs