# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

GOTTLIEB MEMORIAL HOSPITAL, et al.,

      Plaintiffs,

        v.

ROBERT F. KENNEDY, JR., Secretary of Health and Human Services,

      Defendant.[1]

Civil Action No. 24-116 (JDB)

## MEMORANDUM OPINION

It is said that those who can't do, instead teach. But many hospitals both do (i.e., treat) and teach. To compensate for the collateral expenses of teaching on top of treating, Medicare gives teaching hospitals a supplemental payment known as the "indirect medical education" ("IME") payment.

A complicated formula calculates a hospital's IME payment using the ratio of the hospital's residents to beds. The higher this ratio, the theory goes, the more teaching a hospital does—and therefore the more expenses fall through Medicare's cracks, necessitating a higher IME supplement. Because beds are in the denominator of this fraction, the more beds a hospital has, the lower its IME payment.

Until 2013, the Centers for Medicare and Medicaid Services ("CMS") excluded beds dedicated to labor and delivery from its IME calculations.[2] When CMS changed its regulation to

---

[1] See Fed. R. Civ. P. 25(d).

[2] CMS administers the Medicare program on behalf of the Secretary of Health and Human Services. See Univ. Med. Ctr., Inc. v. Sebelius, 856 F. Supp. 2d 66, 70 (D.D.C. 2012). The Secretary is the defendant here, and the

include labor and delivery beds, the plaintiff hospitals' IME payments decreased. The hospitals challenge that change as contrary to the Medicare statute and arbitrary and capricious. Because it is neither, the Court denies their motion for summary judgment and grants the Secretary's cross-motion.

## I.    Legal Background

Medicare is a federal program administered by the Secretary of Health and Human Services ("HHS") that provides health insurance for the elderly and the disabled. Allina Health Servs. v. Sebelius, 746 F.3d 1102, 1105 (D.C. Cir. 2014); Dist. Hosp. Partners, L.P. v. Burwell, 786 F.3d 46, 49 (D.C. Cir. 2015). At issue in this case is Medicare's reimbursement to hospitals for their inpatient services, which falls in Medicare "Part A." See Kaweah Delta Health Care Dist. v. Becerra, 123 F.4th 939, 945 (9th Cir. 2024). For a time, reimbursement operated retrospectively, repaying hospitals for the "reasonable cost" of "inpatient hospital services," where the reasonable cost equaled costs "actually incurred" less those deemed "unnecessary." Rhode Island Hosp. v. Leavitt, 548 F.3d 29, 39 (1st Cir. 2008). Because this approach accounted for a hospital's actual costs, "the reasonable cost system automatically reimbursed teaching hospitals for IME costs related to their teaching programs." Id.

Still, the system failed to capture the full measure of costs associated with teaching while treating. The reasonable cost system featured per diem caps that sometimes shortchanged teaching hospitals. See Rhode Island Hosp., 548 F.3d at 39. So, "[t]o prevent a disproportionate number of teaching hospitals from being adversely affected," the Secretary (by regulation) raised those caps for teaching hospitals and pegged a hospital's cap adjustment to a function of "the ratio of its full-time equivalent (FTE) interns and residents . . . to its number of beds." 45 Fed. Reg. 21582,

---

Court often discusses him as acting on behalf of the program. But where it is clearer to refer to "Medicare" or "CMS" instead, the Court does so. Nothing hinges on these labels. See id. at 70 n.1.

21584 (Apr. 1, 1980).[3]  The basic idea is that the higher the ratio of trainees to beds (and therefore to trained doctors), "the more teaching the hospital will be doing."  Little Co. of Mary Hosp. & Health Care Ctrs. v. Shalala, 165 F.3d 1162, 1164 (7th Cir. 1999).  So as that ratio increases, so does a hospital's IME payment.  Id.

Congress overhauled Medicare in 1983 and, as relevant to this case, shifted from retrospective to prospective assessment of the costs of inpatient care.  See Social Security Amendments of 1983, Pub. L. No. 98-21, § 601, 97 Stat. 65, 149 (1983); Dist. Hosp. Partners, 786 F.3d at 49.  So now Medicare reimburses hospitals for inpatient care through the Inpatient Prospective Payment System ("IPPS"), see 42 U.S.C. § 1395ww(a), (d), which "pays hospitals a fixed amount for each patient" based on that patient's expected cost of care, "regardless of the actual costs incurred," Grant Med. Ctr. v. Hargan, 875 F.3d 701, 703 (D.C. Cir. 2017); see 42 C.F.R. § 412.2(a).

In making this shift, Congress recognized that a prospective payment system threatened teaching hospitals' bottom line.  Because the prospective system blinds itself to actual costs in favor of expected costs based on a patient's diagnosis, the system had no hope of accounting for the costs associated with training new physicians while treating patients.  This time, Congress headed that concern off at the pass, "statutorily adopt[ing] the IME adjustment" that "the Secretary created years earlier."  Rhode Island Hosp., 548 F.3d at 39–40; see also Univ. of Chi. Med. Ctr. v. Sebelius, 618 F.3d 739, 741 (7th Cir. 2010).  Congress instructed the Secretary to implement a similar adjustment to the per diem adjustment the Secretary had devised: "The Secretary shall provide for an additional payment amount for . . . hospitals with indirect costs of medical

---

[3] The concept of "full-time equivalent interns and residents" has come to be a fixture in the regulatory and statutory scheme in this area, and so it will pop up numerous times in this opinion.  Unfortunately, it is a mouthful.  In the interests of brevity and acronym avoidance, the Court will (except when quoting) use "residents" as a shorthand. Nothing is meant by the truncation; in this opinion, "residents" means "full-time equivalent interns and residents."

education." 42 U.S.C. § 1395ww(d)(5)(B) (1984). The adjustment is and was "intended to compensate teaching hospitals for added costs of [in]patient care unremunerated by the prospective payment system." Rhode Island Hosp., 548 F.3d at 44; see also Riverside Methodist v. Thompson, No. C2-02-94 (JDH), 2003 WL 22658129, at *10 (S.D. Ohio July 31, 2003).

But—and importantly here—the 1983 Congress did not yet commit to paper any particular formula for calculating the adjustment. Instead, Congress endorsed the Secretary's previous method of calculation, simply instructing the Secretary to "compute[]" the IME adjustment "in the same manner as the adjustment for [IME] costs under regulations (in effect as of January 1, 1983) under subsection (a)(2) of this section," 42 U.S.C. § 1395ww(d)(5)(B) (1984)—that is, the regulations outlining the per diem adjustment,[4] see 45 Fed. Reg. at 21584; Rhode Island Hosp., 548 F.3d at 40.[5]

A couple years later, Congress revised (and lowered) the IME adjustment.[6] This time, armed with a report from the Congressional Budget Office ("CBO"), Congress got more in the weeds, codifying a formula inspired by the Secretary's preexisting one. Although the statute plugged some figures into the formula, most important for this case is that the statute continued to peg the indirect teaching adjustment factor to "r," where "'r' is the ratio of the hospital's full-time equivalent interns and residents to beds." See Consolidated Omnibus Budget Reconciliation Act of 1985, Pub. L. 99-272, § 9104(a), 100 Stat. 82, 157 (1986). The statute did not define beds (or

---

[4] As explained below, there is some dispute over precisely what regulations Congress intended to incorporate with this somewhat-opaque statement. But, as also explained below, the Court need not pinpoint a precise answer. Suffice it to say that all agree that the statute intended to endorse the Secretary's preexisting IME adjustment to the per diem caps under the reasonable cost system.

[5] Congress offered one edit to the preexisting regulations, but that edit is not directly relevant here. See 42 U.S.C. § 1395ww(d)(5)(B) (1984) (doubling the value of a factor used in the preexisting formula).

[6] See Hearing before the Subcomm. on Health of the S. Comm. on Fin., 100th Cong. 59 (Apr. 7, 1987).

residents, for that matter), and the Secretary continued to do so in its stead.  See, e.g., 51 Fed. Reg. 16772, 16777 (May 6, 1986) (providing that "the number of beds in a hospital is determined by counting the number of available bed days during the hospital's cost reporting period" with certain exclusions).

Congress once again revisited the subject a couple years later, and this time provided the Secretary with more guidance and with more explicit authority.  First the guidance: Congress added a new subdivision to the statute capping the "r" figure central to this case.  The cap provided that "'r' may not exceed the ratio of the number of [the hospital's] interns and residents . . . for its most recent cost reporting period to the hospital's available beds . . . during that cost reporting period." Balanced Budget Act of 1997, Pub. L. 105-33, § 4621(b), 111 Stat. 251, 476 (codified at 42 U.S.C. § 1395ww(d)(5)(B)(vi)).  Next the explicit authority: Congress made clear that "available beds" would be "defined by the Secretary"—as it long had been.  Id.[7]

Some tinkering aside, that is more or less where the statute stands today.  Throughout its evolution, the indirect medical education adjustment has sought to compensate for the "general inefficiencies and extra demands placed on other staff that result from educating" the next generation of physicians and that go unrecognized by the inpatient prospective payment system. Henry Ford Health Sys. v. HHS, 654 F.3d 660, 663 (6th Cir. 2011) (internal quotation marks omitted).  And in all its forms, "r" has represented the ratio of residents to beds—meaning that "the bottom line is that the higher the number of beds, the lower the eventual payment and vice versa."  County of Los Angeles v. Leavitt, 521 F.3d 1073, 1076 (9th Cir. 2008); see also, e.g.,

---

[7] In full, the subdivision reads: "For purposes of clause (ii)"—the clause reciting the IME formula—"'r' may not exceed the ratio of the number of interns and residents, subject to the limit under clause (v), with respect to the hospital for its most recent cost reporting period to the hospital's available beds (as defined by the Secretary) during that cost reporting period."  42 U.S.C. § 1395ww(d)(5)(B)(vi).  The "limit under clause (v)" refers to another new statutory limit pertaining to counting residents.

Altoona Hosp. v. Thompson, 131 F. App'x 355, 355 n.1 (3d Cir. 2005); Little Co. of Mary Hosp., 165 F.3d at 1163; Amisub v. Shalala, Civ. A. No. 94-1883 (TFH), 1995 WL 798910, at *2 (D.D.C. Dec. 4, 1995).

That is as far as Congress has gone. Anything further is elaborated by regulation. And although the statute gives the Secretary guidance on how to count residents and beds, see § 1395ww(d)(5)(B)(vi), it does not tell the Secretary what to count. That is, it does not define (at least not explicitly—but more on that below) either term comprising "r": residents or, central to this case, beds.

So it falls to the Secretary to flesh out the IME adjustment within the statutory guardrails. And because nothing is simple in Medicare, see Henry Ford Health Sys., 654 F.3d at 662, determining a hospital's number of beds involves more than sending someone in with a clipboard. Rather, regulations provide that CMS counts beds via bed days: it counts "the number of available bed days"[8] and divides that number by the number of days in the cost reporting period. 42 C.F.R. § 412.105(b); see Health All. Hosps., Inc. v. Burwell, 130 F. Supp. 3d 277, 285 (D.D.C. 2015). In this way, a hospital's bed count is not a snapshot but an average: it tells the Secretary the average number of available beds a hospital had in a given year. See Leavitt, 521 F.3d at 1081.

As for which beds to count, the Secretary has long looked to whether a bed is located in a part of a hospital dedicated to inpatient care—and thus payable under the inpatient prospective payment system. See, e.g., 68 Fed. Reg. 45346, 45416, 45419 (Aug. 1, 2003). If it is, he generally counts it as a bed (thus decreasing the IME payment); if it isn't, he doesn't (thus increasing the payment). See 59 Fed. Reg. 45330, 45373 (Sept. 1, 1994) ("[I]f the bed days and costs are allowable in the calculation of Medicare's share of inpatient costs, the beds within that unit are

---

[8] A bed is "available" if it is "permanently maintained for lodging inpatients." Leavitt, 521 F.3d at 1077 (internal quotation marks omitted). That is, availability turns not on a bed's occupancy but on its consistent usage.

included as well."). The theory is that the IME payment supplements the IPPS payments intended to reimburse hospitals for their inpatient care—so beds unrelated to inpatient care are beyond the purview of the supplement. This methodology has produced a list of types of bed days the Secretary "excludes" from the "number of available bed days" he uses to calculate a hospital's IME payment. See 42 C.F.R. § 412.105(b).

The content of that list will become important, but for now, a quick detour to another aspect of the Medicare statute. Teaching is not the only laudable activity that balloons a hospital's costs. Serving "a significant number of elderly, very low-income patients" does the same. Allina Health Servs., 746 F.3d at 1105. "Congress assumes that such patients cost more to treat than the average Medicare patient," and so entitles hospitals with this client base to a "disproportionate share hospital" ("DSH") payment to supplement their income under the inpatient prospective payment system. Id.; see also Becerra v. Empire Health Found. for Valley Hosp. Med. Ctr., 597 U.S. 424, 429 (2022); 42 U.S.C. § 1395ww(d)(5)(F)(vi).

This case requires only a shallow understanding of the DSH statute and the payment it provides. The payment is calculated using a figure labeled "patient days." 42 U.S.C. § 1395ww(d)(5)(F)(vi); see Empire Health Found., 597 U.S. at 430–31. Generally (though not always), a hospital has the opposite financial interest in the definition of "patient days" for DSH purposes than it does in that of "bed days" for IME purposes: it wants more patient days (increasing its DSH payment) and fewer bed days (increasing its IME payment). See Empire Health Found., 597 U.S. at 431–33; Clark Reg'l Med. Ctr. v. HHS, 314 F.3d 241, 249 (6th Cir. 2002).

The DSH payment has the same basic intent as the IME one: to account for increased costs (for DSH, those of treating low-income patients) that the inpatient prospective payment system would otherwise leave unpaid. See Empire Health Found., 597 U.S. at 429. So, much like its

treatment of bed days in the IME calculation, CMS only counts as "patient days" those days spent in inpatient parts of the hospital, that is, parts that are subject to the IPPS—the theory again being that, because the DSH payment is meant to fill gaps in Medicare's reimbursement for <u>inpatient</u> services, costs associated with treating low-income patients in other parts of the hospital simply are not relevant. <u>See</u> 68 Fed. Reg. at 45416; 42 C.F.R. § 412.106(a)(1)(ii). But if a patient occupies a bed in a part of the hospital reimbursed by the inpatient prospective payment system, the DSH supplement is necessary to compensate the hospital for the additional cost of treating that patient the IPPS leaves uncompensated.

Because of the parallel between bed days and patient days, the Secretary generally interprets them "in a consistent manner" for the IME and DSH payments. 68 Fed. Reg. at 45415. Both are "limited to beds or patient days in hospital units or wards that would be directly included in determining the allowable costs of inpatient hospital care payable under the IPPS." <u>Id.</u> at 45416. This equivalency, it bears noting, is evenhanded in its give and take for hospital reimbursement. Generally speaking, the IME and DSH equations use these concepts in opposite ways. As a hospital's patient days increase, so does its DSH reimbursement. But as its bed days increase, its IME reimbursement decreases. <u>Cf.</u> <u>id.</u> at 45416 ("Our policies on counting beds are applied consistently for both IME and DSH although the incentives for hospitals can be different for IME and DSH."). The Secretary is mindful of this phenomenon, and has, for instance, sometimes declined to exclude certain beds from its <u>IME</u> count for fear of such a step's negative impact on hospitals' <u>DSH</u> payments. <u>See</u> 59 Fed. Reg. at 45374.

The equivalence of bed days and patient days does not always please hospitals. Because, as a general matter, hospitals would prefer to have fewer available beds (inflating their IME payments) but more patient days (inflating their DSH payments), the Secretary has faced dual-

front litigation: hospitals hoping to buttress their DSH payments protest the exclusion of categories of patient days, while hospitals (like the plaintiffs here) hoping to buttress their IME payments protest the inclusion of categories of bed. One example of the former led to the regulations at issue here. In Northeast Hospital Corporation v. Sebelius, 699 F. Supp. 2d 81 (D.D.C. 2010), aff'd, 657 F.3d 1 (D.C. Cir. 2011), a hospital complained that CMS erroneously excluded patient days spent in labor and delivery beds from its DSH payment. Id. at 95. CMS forthrightly conceded error, citing its longstanding policy of excluding from the patient day calculation time spent in beds not attributable to the IPPS. The "decision to exclude these days," CMS explained, "was premised on the erroneous belief that costs attributable to labor and delivery room patients were not treated as inpatient operating expenses." Id. (internal quotation marks omitted). Because patient days spent in labor and delivery beds are treated as inpatient operating expenses, CMS acknowledged that it should have—consistent with its longstanding practice—included them as "patient days" in the DSH calculation. See id. And so CMS changed the regulation accordingly (the "2010 Rule"). See 74 Fed. Reg. 43754, 43900 (Aug. 27, 2009).

But that change wrought an inconsistency between the definitions of DSH "patient days" and IME "bed days." Traditionally, remember, "in light of the similar policy rationales" behind patient days and bed days, the agency defined them in tandem: a day spent in a bed payable under the IPPS would be counted as a patient day—and that bed would be counted as a bed. 77 Fed. Reg. 53258, 53412 (Aug. 31, 2012). To maintain the equivalence post-Northeast Hospital, the Secretary began "includ[ing] labor and delivery bed days in the count of available beds used in the IME" formula (the "2013 Rule"). 77 Fed. Reg. at 53412. And the change was further justified, CMS explained, for the same reason the Northeast Hospital change was justified: because (contrary to its earlier understanding) services furnished in a labor and delivery bed are generally

payable under the IPPS.  77 Fed. Reg. at 53411.  So CMS removed labor and delivery beds from the list of excluded beds in 42 C.F.R. § 412.105(b).  See id. at 53413.

Whereas the Northeast Hospital change generally benefitted hospitals, this one hurt them. The Secretary estimated that the inclusion of labor and delivery beds in the available bed day count would decrease IME payments by $40 million in fiscal year 2013.  See 77 Fed. Reg. at 53734.

## II.    Procedural History

The plaintiffs here, a group of not-for-profit teaching hospitals, are among the hospitals hurt.  See Compl. [ECF No. 1] ¶¶ 1, 9–28.  Believing themselves unlawfully stiffed by the Secretary's 2013 Rule adding labor and delivery beds to their IME bed count, they filed administrative appeals with the Provider Reimbursement Review Board, challenging as too low their IME payments for 2014, 2015, 2016, and 2018.  See Compl. ¶¶ 7–8; 42 U.S.C. § 1395oo(a). Because the Board lacked authority to declare the regulation unlawful, it granted expedited judicial review under 42 U.S.C. § 1395oo(f)(1).  See Expedited Judicial Review Decisions [ECF No. 1-1] at 11, 23, 34, 48.  That decision allowed the hospitals to "go directly to district court."  Billings Clinic v. Azar, 901 F.3d 301, 311 (D.C. Cir. 2018) (citing 42 U.S.C. § 1395oo(f)(1) and 42 C.F.R. § 405.1842).

So the hospitals came here, asking this Court to vacate the 2013 Rule (in its entirety or as applied to the plaintiff hospitals) and order the Secretary to pay the hospitals the IME amounts that would have resulted if the Secretary had continued excluding labor and delivery beds from the bed count.  See Compl. at 22.  Their subsequent motion for summary judgment challenges the 2013 Rule on two grounds.  See Mem. of P. & A. of Pls. in Supp. of Mot. Summ. J. [ECF No. 14-1] ("Mot.").  First, they argue that the rule violates the Medicare statute because the statute commands the Secretary to use the same definition of beds used in 1983 and gives him no leeway to define

beds otherwise. <u>Id.</u> at 16–21. Second, they argue that even if the Rule is statutorily permissible, it is arbitrary and capricious because (1) it was ill-explained; (2) the link between beds and patient days is irrational; and (3) the Secretary did not perform a new statistical analysis demonstrating that its rule would result in IME payments more accurately approximating actual teaching costs. <u>Id.</u> at 21–25. The Secretary cross-moves for summary judgment, highlighting the statute's explicit grant of authority to define "available beds" and the reasoned basis for the 2013 Rule. <u>See</u> Def.'s Cons. Mem. in Opp'n to Pls.' Mot. & in Supp. of Cross-Mot. for Summ. J. [ECF No. 16-1] ("Cross-Mot.") at 17–30, 30–37.

### III.    Legal Standards

This Court has jurisdiction under 42 U.S.C. § 1395oo(f)(1), which imports the APA's standard of review. <u>See</u> <u>New LifeCare Hosps. of N.C., LLC v. Becerra</u>, 7 F.4th 1215, 1222 n.1 (D.C. Cir. 2021). "[W]hen a party seeks review of agency action under the APA, . . . the district judge sits as an appellate tribunal," with summary judgment providing the "mechanism for deciding whether as a matter of law the agency action is supported by the administrative record and is otherwise consistent with the APA standard of review." <u>Health All. Hosps.</u>, 130 F. Supp. 3d at 288 (internal quotation marks omitted). The APA instructs a court to set aside agency action that is "in excess of statutory jurisdiction, authority, or limitations," 5 U.S.C. § 706(2)(C), or that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," § 706(2)(A).

The Court must approach the hospitals' two arguments with two quite different attitudes. In discerning the Secretary's statutory authority, the Court must exercise its "independent judgment in deciding whether [CMS] has acted within its statutory authority" under the "best reading" of the statute. <u>Loper Bright Enters. v. Raimondo</u>, 603 U.S. 369, 400, 412 (2024). If CMS acted

within its statutory authority, however, the Court's role becomes significantly more deferential.  In that circumstance, it ensures only that CMS has "engaged in 'reasoned decisionmaking' within those boundaries," id. at 395 (quoting Michigan v. EPA, 576 U.S. 743, 750 (2015)), resisting any temptation to "substitute its judgment for that of the agency," Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto Ins. Co., 463 U.S. 29, 43 (1983).

## IV.    Analysis

The hospitals' argument fails on all fronts.  The Secretary has the authority to define beds because the statute explicitly grants him that authority.  Even absent such an explicit grant, he would have that authority as part of his general responsibility to implement the statute, as (contrary to the hospitals' contention) the statute does not freeze the definition of beds used in 1983.  And the Secretary reasonably exercised his authority when he added labor and delivery beds to the definition of beds in the 2013 Rule.

### a.  The statute explicitly delegates bed-defining authority to the Secretary.

The Secretary's long-exercised authority to define beds is consistent with the statute.  See 42 U.S.C. § 1395ww(d)(5)(B)(vi)(I).  Indeed, it is arguably commanded by the statute: "Congress explicitly delegated a definition of 'available beds' to the Secretary," opting to leave that task to the Secretary rather than undertake it itself.  Cnty. of Los Angeles, 521 F.3d at 1081; see also Altoona Hosp., 131 F. App'x at 357; § 1395ww(d)(5)(B)(vi)(I) (explaining that "available beds" shall be "defined by the Secretary").  In other words, Congress "expressly delegate[d]" to the Secretary "the authority to give meaning to a particular statutory term": available beds.  Loper Bright, 603 U.S. at 394–95.

The hospitals do not (because they cannot) contest that the statute delegates to the Secretary authority to define "available beds."  Instead, they latch onto the word "available."  As they point

out, the statute's recitation of the IME formula simply references "beds," with no mention of their availability: "'r' is the ratio of the hospital's full-time equivalent interns and residents to beds." § 1395ww(d)(5)(B)(ii). It isn't until a few subdivisions later that the statute elaborates on and caps "r," instructing that the figure "may not exceed the ratio of the number of interns and residents" to "available beds (as defined by the Secretary)." § 1395ww(d)(5)(B)(vi)(I). Given this structure and the linguistic difference between "beds" and "available beds," the hospitals argue that the delegation merely permits the Secretary to define <u>which</u> beds are available. And it follows, they say, that the delegation does not include the authority to exclude (or include) additional categories of beds—only to ascertain a certain bed's availability. Reply Supp. Pls.' Mot. & Opp'n to Cross-Mot. [ECF No. 18] ("Pls.' Reply") at 13–17.

Fair enough. As is true of many parts of the Medicare statute, the "ordinary meaning" of this delegation "does not exactly leap off the page." <u>Empire Health Found.</u>, 597 U.S. at 434. The first appearance of the term "beds" neither explicitly delegates its definition to the Secretary nor includes the word "available"—both inclusions one might expect if Congress intended to grant the Secretary the authority he claims.

But courts have not made much of the distinction between "beds" and "available beds," instead generally treating the two as essentially interchangeable. <u>See, e.g.</u>, <u>Cnty. of Los Angeles</u>, 521 F.3d at 1081; <u>Altoona Hosp.</u>, 131 F. App'x at 357; <u>Clark</u>, 314 F.3d at 247 (rejecting "attempt to distinguish between a 'bed' and an 'available bed day'"). That may be because the Secretary has long done the same. For instance, the regulation explaining how to "[d]etermine[] . . . the number of beds" says that it is done "by counting the number of available bed days," "exclud[ing] bed days associated with" certain types of beds. 42 C.F.R. § 412.105(b). Similarly, the Secretary understands the statutory cap to "provide[] that the ratio of residents-to-beds may not exceed the

ratio" from the prior cost reporting period (after accounting for a separate cap on residents), 63 Fed. Reg. 26318, 26323 (May 12, 1998)—an understanding that makes sense only if "beds" and "available beds" are equivalent, given that "available beds" only contribute to last year's ratio while "beds" contribute to this year's.[9]

    With this agency usage in view, it is apparent that Congress's reference to "available beds" did not come out of nowhere. The Secretary's use of the term to define "beds" predates Congress's addition of that term (and the accompanying explicit delegation) to the statute in 1997. In 1985, for instance, the Secretary explained that he calculates a hospital's "number of beds . . . by counting the number of available bed days." 50 Fed. Reg. 35646, 35690 (Sept. 3, 1985); see also id. at 35679. Ten years later, he reiterated that the figure utilizes "the number of available bed days." 59 Fed. Reg. at 45373 (internal quotation marks omitted). And importantly here, both times he defined "available beds" to exclude certain categories of beds, not simply to ascertain a particular bed's availability. See id. (explaining that "the definition of available beds" has consistently excluded "beds in . . . hospital areas" not subject to the IPPS).

    Given that history, Congress's 1997 codification of the term "available beds" was likely a nod to (and endorsement of) the Secretary's consistent practice of defining "beds" by reference to "available beds"—and of excluding certain bed categories from eligibility. That history, combined with the "aid" the Court may seek "from the interpretations of those responsible for implementing" the statute, see Lissack v. Comm'r of Internal Revenue, 125 F.4th 245, 259 (D.C. Cir. 2025)

---

    [9] Note that this cap does not mean the ratio may never increase no matter a hospital's efforts. The cap on "r" looks to the actual ratio—uncapped—from the prior year. So, as the Secretary recognized shortly after the cap's passage, the cap simply implements "a one-year delay for legitimate changes" in a hospital's ratio. 63 Fed. Reg. at 26324. "An increase in the ratio thereby establishes a higher cap for the following cost reporting period." Id.

(quoting Loper Bright, 603 U.S. at 394), convinces the Court that the Secretary has the "best reading" of the statute, Loper Bright, 603 U.S. at 395.[10]

The hospitals do not offer a sensible alternative reading of the statute. Indeed, they accidentally endorse the Secretary's. They understand the "may not exceed" cap just as the Secretary does: under that cap, the hospitals say, "the interns and residents to beds ratio in any one year cannot exceed that ratio in the prior year." Pls.' Reply at 14. But this reading of the cap necessarily collapses "beds" with "available beds." Recall that the statutory definition of "r" only mentions "beds" (for calculating the present year's ratio), while the cap mentions "available beds" (in comparing the present year's ratio to last year's). Compare § 1395ww(d)(5)(B)(ii) with § 1395ww(d)(5)(B)(vi)(I). If the terms were meaningfully different, the cap would compare apples to oranges. As the hospitals admit, it compares apples to apples. Pls.' Reply at 14.

### b. Regardless, the statute does not abrogate the Secretary's bed-defining authority.

That explicit delegation is enough to reject the hospitals' statutory argument. But because it is a difficult and close question, it is worth explaining why the delegation is not strictly necessary to validate the rule at issue. Even if the statute did not explicitly grant the Secretary authority to define available beds, its silence on the definition would leave him with "the responsibility of filling this gap." Health All. Hosps., 130 F. Supp. 3d at 285 (so concluding with regard to defining beds for the DSH payment). Without some additional statutory limitation, defining the (undefined) word "beds" would fall within the Secretary's general authority to implement the Medicare statute.

---

[10] The hospitals discount the invocation of this authority as a post-hoc rationalization. See Pls.' Reply at 17. This is incorrect. The Secretary invoked the explicit delegation in its 2003 rulemaking, explaining that it "provide[s] the Secretary with administrative discretion to define beds." 68 Fed. Reg. at 45416. The 2013 Rule incorporated the 2003 one. See 77 Fed. Reg. at 53411.

See 42 U.S.C. § 1395hh(a)(1) (empowering the Secretary to "prescribe such regulations as may be necessary" to administer Medicare).

The hospitals do not dispute that statutory silence would leave the Secretary that responsibility. But they maintain that the statute is not silent on the matter. Per the hospitals, the statute did define "beds" in roundabout fashion when it instructed the Secretary to "compute[]" the IME payment "in the same manner as the adjustment for such costs under regulations (in effect as of January 1, 1983) under subsection (a)(2)." 42 U.S.C. § 1395ww(d)(5)(B).

The hospitals' multistep argument goes something like this. First: "The referenced regulations are almost certainly a reference to the calculation description included in" the 1980 proposed notice in which the Secretary proposed the predecessor to the IME payment. Mot. at 16–17; see 45 Fed. Reg. at 21584. That notice, the hospitals realize, does not itself define "beds." See Pls.' Reply at 4. So, second: the hospitals insist that a 1976 Provider Reimbursement Manual demonstrates that, at the time, the Secretary excluded labor and delivery beds from the definition. Mot. at 17; Pls.' Reply at 4.[11] As a result, third: Medicare cost report data in 1981 must have excluded labor and delivery beds. Mot. at 7, 17. And so fourth: when the Congressional Budget Office assessed teaching hospitals' costs in 1985 using that 1981 data, it must have excluded labor and delivery beds. Id. at 6–7, 17. Because (fifth) Congress subsequently relied on the CBO report, the hospitals conclude that Congress must have intended to freeze the definitions of each factor contributing to that 1985 report. (Never mind that Congress codified the language two years prior.)

---

[11] The manual is sub-regulatory guidance, a type of interpretative rule "issued by an agency to advise the public of the agency's construction of the statutes and rules which it administers." Shalala v. Guernsey Mem'l Hosp., 514 U.S. 87, 99 (1995) (internal quotation marks omitted).

"Any . . . tweak" to those factors would throw off the delicate formula Congress enacted, the hospitals urge, and thus "is not permitted by statute."  Id. at 17.[12]

While the argument is enough to make one's head spin, the response to it is not.  When Congress instructed the Secretary to calculate the adjustment in the same "manner" as before, it instructed him to use the same "mode of procedure" or "way of acting."  Manner, Webster's Ninth New Collegiate Dictionary 724 (1984).[13]  To maintain the same "mode of procedure" or to compute the adjustment in the same "way," the Secretary doubtless needed to adhere to the formula—but he did not need to freeze the definitions of each constituent variable.

Consistent with this language, the First Circuit has explained that "Congress'[s] prefatory instruction regarding the computation of the IME adjustment merely directs the Secretary, as a general matter, to calculate a hospital's IME adjustment using the formula" he had instituted under the reasonable cost system.  Rhode Island Hosp., 548 F.3d at 41.  Said otherwise, that instruction simply endorsed the Secretary's practice that preceded the IME payment's enactment into statute— and recall that such endorsement was necessary because the original version of the statute included no formula at all.  It did not "abrogate the Secretary's authority to regulate the proper calculation of an indeterminate variable, such as a hospital's ratio of [residents] to beds, in the IME equation." Id.; see also id. at 41 n.19.

---

[12] As the Secretary points out, there might be even more steps to the plaintiffs' argument.  To account for the fact that subsection (a)(2) entered the statute in 1982, the hospitals might also have to bounce from a 1982 rulemaking back to the 1980 one before reaching the 1976 Provider Reimbursement Manual.  See Cross-Mot. at 22 & n.1; Pls.' Reply at 3; see also 47 Fed. Reg. 43296, 43310 (Sept. 30, 1982).  No matter; the Court will spare the reader, as the argument fails either way.  The Court will similarly skip an exploration of the Secretary's objection to the hospitals' factual premise—that the Secretary in fact had a practice in 1983 of excluding labor and delivery beds—as it is ultimately irrelevant.  See Defs.' Reply at 16–18.

[13] See also, e.g., Manner, Webster's Third New International Dictionary of the English Language Unabridged 1376 (1981) ("the mode or method in which something is done"; "a mode of procedure or way of acting"); Manner, The Random House College Dictionary Revised Edition 814 (revised ed. 1982) ("way of doing," "method," or "mode").

The hospitals' attempts to cast the First Circuit's understanding of that instruction as either "idiosyncratic" or undermined by Loper Bright fail.  None of the cases they cite adopts anything close to their understanding of the instruction to compute the IME adjustment "in the same manner" as the Secretary had pre-codification.  Indeed, many of the cases they cite don't so much as mention the phrase.  See Pls.' Reply at 10–11.[14]  So if the First Circuit is idiosyncratic, it is only because no other courts have been pressed to decide the issue, not because they have decided it as the hospitals propose.  Nor was the First Circuit's decision improperly Chevron-based; while other parts of that decision deferred to the agency's interpretation, the court considered this issue "clear," leaving no need to "speculate."  Rhode Island Hosp., 548 F.3d at 40.

While the First Circuit may be alone among courts to address the question, it is not alone altogether.  Unsurprisingly, the Secretary has—in the course of repeatedly adjusting the IME payment calculation methodology—frequently expressed his understanding that the "in the same manner" language instructed him to adopt "the general policy in effect" in 1983 "rather than the exact method of implementing that policy."  55 Fed. Reg. 35990, 36061 (Sept. 4, 1990); 51 Fed. Reg. 31454, 31457 (Sept. 3, 1986) (disclaiming "authority to adjust the formula" in the statute while exercising authority to adjust its inputs); see Cross-Mot. at 24–25 (collecting similar examples).  That Congress's subsequent (and frequent) attention to the IME payment yielded no course correction—no reminder "to hew to the 'regulations . . . in effect' in 1983," Cross-Mot. at 24—further suggests that the Secretary has it right.  See Rhode Island Hosp., 548 F.3d at 41 n.19.

---

[14] The one (reversed) case that helps the hospitals at all interpreted the "in the same manner" instruction to refer to a definition of "residents" in the 1982 Federal Register publication—a decent first step, but about four short of what the hospitals need to prevail, given that the publications the hospitals rely on do not define "beds."  See Henry Ford Health Sys. v. Sebelius, 680 F. Supp. 2d 799, 810 (E.D. Mich. 2009), rev'd Henry Ford Health Sys. v. HHS, 654 F.3d 660 (6th Cir. 2011).

In the hospitals' retelling, Congress's mandate gets subtly reworded. The hospitals say that the clause "requires that the factors used in the IME calculation, including the bed count, remain consistent with the manner in which they were calculated in 1983." Mot. at 1. But the statute says nothing of "factors." Instead, it says in much more general language that the IME payment must be "computed in the same manner" as under 1983 regulations. For the reasons explained, that language cannot do the work the hospitals ask of it.

The hospitals raise one more protest under the statute. They point out that the IME payment seeks to "measure . . . teaching intensity for the institution as a whole" rather than account for costs arising from individual beds. Mot. at 19. The Secretary's decision to include labor and delivery beds in the bed count, they say, evinces an inappropriate "focus[] on the individual bed." Id.

What the hospitals omit is that the IME formula has <u>always</u> excluded certain bed types and included others. Indeed, it is the decision to bring labor and delivery beds into the bed count (from which they had previously been excluded) that the hospitals protest. That is, the IME payment has always "focused on the individual bed" in that it has always categorized beds as either included or excluded. The hospitals' complaint is not with counting bed types but with the bed types counted—and, more precisely, with who decides which bed types to count. As explained above, that decision rests with the Secretary.

### c. The 2013 Rule was not arbitrary and capricious.

"Of course, the Secretary's statutory authority . . . is not unlimited," <u>Batterton v. Francis</u>, 432 U.S. 416, 428 (1977), so the hospitals have a backup if their statutory argument fails. Even if the statute permits the Secretary to define "beds," they insist that <u>this</u> definition is unlawful because it was inadequately reasoned and thus arbitrary and capricious. Mot. at 21. In assessing this argument, the Court's job is to "ensure that the agency has examined the relevant data and

articulated a satisfactory explanation for its action including a rational connection between the facts found and the choices made." Billings Clinic, 901 F.3d at 312–13 (cleaned up).

The Secretary erects a threshold obstacle to the Court's consideration of the hospitals' arbitrary-and-capricious argument. "Generally, 'a party must initially present its comments to the agency during the rulemaking in order for [a] court to consider the issue.'" Cal. Cmtys. Against Toxics v. EPA, 928 F.3d 1041, 1049 (D.C. Cir. 2019) (quoting Tex Tin Corp. v. EPA, 935 F.2d 1321, 1323 (D.C. Cir. 1991)); see also, e.g., Koretoff v. Vilsack, 707 F.3d 394, 397 (D.C. Cir. 2013) (per curiam). Failure to do so forfeits the argument, as it deprives the agency of "an opportunity to consider the matter, make its ruling, and state the reasons for its action." Okla. Dep't of Env't Quality v. EPA, 740 F.3d 185, 192 (D.C. Cir. 2014) (quoting Unemployment Comp. Comm'n of Alaska v. Aragon, 329 U.S. 143, 155 (1946)). Invoking this doctrine, the Secretary says the argument is forfeited and thus not properly before the Court.

The hospitals do not point to a comment objecting to the now-challenged change on these or similar grounds when the agency first contemplated it. See Cross-Mot. at 33–34; Pls.' Reply at 24; Def.'s Reply at 19. But, as the hospitals rightly argue, no comment was necessary. The failure to comment foreclosed the hospitals' right to challenge the 2013 rule on its face, that is, absent its direct application to them. See, e.g., Koretoff, 707 F.3d at 397–98. The hospitals do not pursue such a challenge. Instead, they "timely challenge the application of a regulation" to them—by following the statutorily-prescribed process for protesting payment determinations, first with the Provider Reimbursement Review Board and then with this Court. E. Tex. Med. Ctr.-Athens v. Azar, 337 F. Supp. 3d 1, 13 (D.D.C. 2018). As multiple judges in this District have concluded, the (here undisputed) compliance with that procedure is enough to preserve the issue for this Court's review. See id. at 13–14 (collecting cases); Milton S. Hershey Med. Ctr. v. Becerra, Civ. A. No.

19-2680 (TJK), 2021 WL 1966572, at *4 (D.D.C. May 17, 2021); see also Koretoff, 707 F.3d at 399 (forfeiture does not preclude ability to challenge rule "if and when the Secretary applies" it).

Still, the hospitals' failure to make themselves heard in the agency's rulemaking process is relevant to the Court's arbitrary and capricious review. "[W]hether comments have been presented to the agency matters in applying the arbitrary and capricious standard of review," Banner Health v. Burwell, 126 F. Supp. 3d 28, 69 (D.D.C. 2015), rev'd in part on other grounds sub nom. Banner Health v. Price, 867 F.3d 1323 (D.C. Cir. 2017), because "agencies have no obligation to anticipate every conceivable argument," Koretoff, 707 F.3d at 398. Without a comment prompting further explanation, the Secretary is left only to fulfill his "affirmative burden of promulgating and explaining a non-arbitrary, non-capricious rule." Okla. Dep't of Env't Quality, 740 F.3d at 192.

The Secretary fulfilled this duty. The 2013 Rule began by noting the similar "underlying concepts" driving the IME and DSH adjustments and the resulting "consistent manner" in which the Secretary interprets them. 77 Fed. Reg. at 53411. It then explained the 2010 shift "to include in the . . . DSH payment adjustment all patient days associated with patients occupying labor and delivery beds once the patient has been admitted to the hospital as an inpatient." Id. It recited the "rationale for adopting th[at] change": "that the costs associated with labor and delivery patient days are generally payable under the IPPS." Id. And it noted the resulting discrepancy: because Northeast Hospital only triggered a change in the DSH payment, the Secretary had not made "a similar change to [the] policy for counting hospital beds" in the IME payment, meaning that, "while the services furnished to a labor and delivery patient are considered to be generally payable under the IPPS, . . . the bed where the services are furnished is not considered to be available for IPPS-level acute care hospital services" for IME purposes. Id. at 53411–12. That discrepancy, the

Secretary explained, was "inappropriate" because "patient day and bed day policies" should be "align[ed]."  Id. at 53412–13.  So he aligned them.  Id. at 53413.

Notable too is the Secretary's decades-long consistency in this alignment.  As a result, the 2013 Rule is not the only source of explanation.  The 2013 Rule referred the reader to a 2003 rule explaining that beds and patient days "should generally be interpreted in a consistent manner" such that CMS counts only "beds or patient days in hospital units or wards that would be directly included in determining the allowable costs of inpatient hospital care payable under the IPPS."  68 Fed. Reg. at 45415–16.  Whether looking only at the challenged rule or tracing its predecessors, then, the Secretary made it easy to "discern the agency's path."  Grant Med. Ctr., 875 F.3d at 707 (internal quotation marks omitted).  The APA requires nothing more by way of explanation.

Although the hospitals frame their arbitrary and capricious argument mainly as a failure of explanation, they veer at times into attributing to the Secretary a more substantive error.  Explained or not, the hospitals suggest, the Secretary's link between DSH patient days and IME beds simply makes no sense because they are entirely unrelated concepts.  See Mot. at 24; Reply at 22.

To be clear, the Secretary did not pair these concepts simply because he felt like it.  As the agency has repeatedly articulated, the pairing reflects the shared "policy rationale[]" behind the IME and DSH adjustments, 77 Fed. Reg. at 53412: to account for the IPPS's blind spots.  As a result, "[w]hen the application of IPPS payment policy is dependent on a determination of a hospital's number of beds, it seems reasonable to base that determination on the portion of the hospital that generates the costs that relate to those IPPS payments."  68 Fed. Reg. at 45419.  Said otherwise, beds falling outside the IPPS reimbursement apparatus are simply irrelevant to the IME and DSH adjustments.  Cf. Riverside Methodist, 2003 WL 22658129, at *10 ("The entire IME program was created in order to adequately compensate teaching hospitals when the reasonable

cost system was changed to the prospective payment system.").  This basic insight applies in all sorts of contexts; it is the same insight driving the Secretary's uncontroversial position that, "since the IME and DSH adjustments are part of the IPPS, [he] read[s] the statutory references to beds and days to apply only to inpatient beds and days."  68 Fed. Reg. at 45416–17.

And the "beds" figure performs a similar role in the IME statute that "patient days" plays in the DSH statute.  Recall that the Secretary counts beds vis-a-vis bed days.  See Amisub, 1995 WL 798910, at *1 ("Consistent with the adjustment's purpose, the formula for calculating the IME adjustment requires counting all patient days in beds reimbursed through PPS rates."); cf. Health All. Hosps., 130 F. Supp. 3d at 294 (discussing the intertwined definitions of "available bed days," "available beds," "beds," and "bed days").  And determining a patient day's eligibility for IPPS reimbursement requires asking what sort of bed the patient day was "associated with."  See, e.g., 68 Fed. Reg. at 45416.  So the link between beds and patient days is natural: a patient day spent in an IPPS-eligible bed (that is, an "available bed" for IME purposes) counts as a patient day for DSH purposes.  Recognizing that link, the Secretary has a "longstanding policy to treat days, costs, and beds similarly."  Id. at 45419.

As a result, another judge in this District concluded that it is reasonable for the Secretary "to attempt, where possible, to interpret the terms so that they are consistent."  Health All. Hosps., 130 F. Supp. 3d at 304 ("it is not unreasonable for the agency to implement the scheme such that two related, but distinct terms—'patient days' and 'bed days'—are interpreted similarly where possible").  This Court agrees.  Indeed, courts have faulted the Secretary for straying from similarly longstanding pairings between DSH and IME concepts.  See, e.g., Clark, 314 F.3d at 249 ("Having clearly coordinated the counting of beds for both the IME and DSH programs, the Department cannot simply interpret the regulation to vary so as to always disadvantage the subject hospital.").

The Secretary was not obligated to, as a commenter urged in the rulemaking process, make an "exception" to the historic consistent treatment for labor and delivery beds.  See J.A. [ECF No. 21] at 45.  Consistency is a virtue, and the Secretary did not act arbitrarily and capriciously in seeking it.

Finally, the hospitals suggest that it was unreasonable for the Secretary to change the definition of beds without extensive study.  This argument picks up where the statutory one left off.  The statute, the hospitals point out, enacts a delicate and precise formula based on the CBO's 1985 calculation.  The hospitals fear that changing a factor that contributed to the calculation throws off the balance Congress struck.  And so, at least without a brand-new regression analysis showing that the change will more accurately approximate actual expenses, the Secretary is forbidden from changing the factor.  See Pls.' Reply at 22.

This argument fares no better.  It is in considerable tension with a premise the hospitals emphasize: that the IME payments seek to compensate for costs "that simply could not be accurately or even feasibly measured."  Riverside Methodist, 2003 WL 22658129, at *7.  The IME payment statute may be detailed, but it is not particularly precise; the most it can do is serve as "a proxy to account for a number of factors which may legitimately increase costs in teaching institutions."  Id.  And the argument is in similar tension with the lack of "a generic obligation on agencies to always use the best available data," Dist. Hosp. Partners, 786 F.3d at 56, which in any event would be an odd way to describe the half-century-old data (collected under an entirely different reimbursement scheme) on which the hospitals would have the Secretary rely, see Alabama v. U.S. Army Corps of Eng'rs, 704 F. Supp. 3d 20, 122 (D.D.C. 2023) ("reliance on data that is 'too stale' can amount to unlawful agency action"); Dist. Hosp. Partners, 786 F.3d at 62

(discouraging reliance on "data that was collected when hospitals were still reimbursed" retrospectively rather than prospectively).

The hospitals repeatedly disparage the Secretary's coordination of the terms "patient days" and "bed days" as based in mere "administrative convenience."  See, e.g., Mot. at 9. Administrative convenience, it should be said, is not anathema to the APA; it is a legitimate concern agencies may consider.  See, e.g., Ashland Expl., Inc. v. FERC, 631 F.2d 817, 822 (D.C. Cir. 1980) ("[A]n agency . . . may rationally turn to simplicity . . . and administrative convenience, at least where no fundamental injustice is caused."); Dist. Hosp. Partners, 786 F.3d at 61.  But in any event, the hospitals undersell the Secretary's reasoning.  As explained above, the Secretary did not coordinate for coordination's sake, but rather coordinated in recognition of the similar goals and functions of the IME bed count and the DSH patient day count.  That was a reasonable decision reasonably explained, and the APA demands no more.  See Grant Med. Ctr., 875 F.3d at 708 (court's "task is not to test whether the agency chose the best solution, only a reasonable one") (internal quotation marks omitted).

## <u>Conclusion</u>

For the above reasons, the Court will deny the plaintiffs' motion for summary judgment and grant the defendant's cross-motion for summary judgment.  A separate order will issue.

/s/
_____
JOHN D. BATES
United States District Judge

Dated: <u>March 25, 2025</u>